

U.S. Department of Justice

*United States Attorney*
*Eastern District of New York*

DMP:RTP/ICR/JGH
F. #2017R00137

*271 Cadman Plaza East*
*Brooklyn, New York 11201*

July 18, 2022

By ECF

The Honorable Ramon E. Reyes, Jr.
United States Magistrate Judge
Eastern District of New York
225 Cadman Plaza East
Brooklyn, NY 11201

      Re:    United States v. Sherry Li and Lianbo Wang
                  Docket No. 22-MJ-756

Dear Judge Reyes:

        The defendants Sherry Li and Lianbo Wang were arrested earlier today and will appear before Your Honor to be presented on a complaint (the "Complaint") charging them with wire fraud conspiracy, in violation of Title 18, United States Code, Sections 1343 and 1349; money laundering conspiracy, in violation of Title 18, United States Code, Section 1956(h); and conspiracy to defraud the United States, in violation of Title 18, United States Code, Section 371. The government respectfully submits that both defendants are significant flight risks due to: (1) the seriousness of the charged offenses and the overwhelming evidence of their guilt and (2) their significant and longstanding ties, including frequent and extended travel, to the People's Republic of China ("PRC") and, in Wang's case, also to the United Arab Emirates, countries that do not have extradition treaties with the United States.

        In light of the serious risk of flight that each defendant poses, the government submits that the defendants should be released pending trial only if they each present a bail package that would reasonably assure their continued appearance at future court dates, which, in the government's view would include, at a minimum: the posting of substantial and meaningful assets, including personal assets by family members or friends living in the United States; full disclosure of the defendants' financial assets and holdings, including those located in the PRC; surrender of all passports; location monitoring; and strict limitations on the defendants' movements.

        Additionally, the government will seek that any proposed bond include a prohibition against both defendants contacting any victims or witnesses in the case. The government notes that one of the defendants' co-conspirators, who is located in the PRC, has

encouraged victim-investors not to cooperate with the government's investigation. Accordingly, the government requests that as a condition of release the Court order the defendants not to have contact with any current or past investors in the TEC Project, the names of which will be provided to the Court and the defendants should the defendants be released.

I.      The Defendants' Criminal Scheme

As set forth in greater detail in the Complaint, the defendants orchestrated a nearly decade-long scheme to defraud investors in a fictitious project to develop, build and operate a private educational institution in Sullivan County, New York, called the "Thompson Education Center" (the TEC Project). The defendants solicited victim-investors, many of them foreign nationals located outside of the United States, by falsely representing the progress they were making on the TEC Project and its support from government officials, including by sending investors and prospective investors promotional materials that included photographs of Li, the TEC Project's President, with prominent U.S. politicians. Many foreign national victims were persuaded to invest in the TEC Project by, among other things, the defendants' false assurances that their $500,000 investments would guarantee them lawful permanent residence in the United States through the EB-5 investment visa program administered by the Department of Homeland Security, U.S. Citizenship and Immigration Services.

As alleged, Li, Wang and other members of the conspiracy siphoned off the money they fraudulently obtained from investors by transferring the funds through bank accounts held in the names of various companies that Li had created. Once the funds were in those accounts, Li and Wang used the funds to pay for numerous personal expenses including clothing and accessories, jewelry, housing, vacation travel, upscale dining, and political contributions to prominent politicians.

As of July 2022, more than 150 investors have invested at least $27 million in the TEC Project, including approximately $16.5 million from EB-5 investors who were promised a green card in return for their investment, and approximately $11 million from stock investors who were promised that an IPO would take place. As of March 2022, Li, Wang, and their co-conspirators have misappropriated and laundered at least $2 million in TEC Project investor funds. During this same period, Li, Wang and their co-conspirators spent at least an additional $2.5 million dollars in investor funds on various personal expenses with no clear business purpose, none of which was reported as income to the Internal Revenue Service by Li or Wang. To date, no EB-5 investor in the TEC Project has received a temporary or permanent green card and the TEC Project has not made an IPO or been listed on any stock exchange.

In furtherance of their scheme, Li and Wang also acted as "straw donors" for foreign nationals to unlawfully contribute to campaigns supporting U.S. politicians and political committees. Among other things, Li and Wang promised foreign nationals access to U.S. political events and politicians in exchange for a fee. Li and Wang used the money they received from foreign nationals to fund political contributions, and falsely identified themselves and other U.S. citizens as the contributors of the funds, in violation of the Federal Election Campaign Act (FECA) and FEC regulations. In some cases, Li and Wang used TEC

investors' investment funds to make the political contributions that they used to gain access to the political events, where Li and Wang took photographs with elected officials. Li and Wang then used the photographs as a marketing tool in soliciting investments from foreign nationals in the TEC Project.

II.     Applicable Law

Under the Bail Reform Act, 18 U.S.C. § 3141 et seq., federal courts are empowered to order a defendant's detention pending trial upon a determination that the defendant is either a danger to the community or a risk of flight. 18 U.S.C. § 3142(e). While a finding of dangerousness must be supported by clear and convincing evidence, United States v. Ferranti, 66 F.3d 540, 542 (2d Cir. 1995), risk of flight can be proven by a preponderance of the evidence, United States v. Jackson, 823 F.2d 4, 5 (2d Cir. 1987).

Four factors guide the Court's determination of whether the defendant should be released on bail: (1) the nature and circumstances of the crimes charged; (2) the "weight of the evidence against" the defendant; (3) the "history and characteristics" of the defendant, including "financial resources, "past conduct" and "criminal history"; and (4) the seriousness of the danger posed by the defendant's release. 18 U.S.C. § 3142(g).

Evidentiary rules do not apply at detention hearings and the government is entitled to present evidence by way of proffer, among other means. See 18 U.S.C. § 3142(f)(2); see also United States v. LaFontaine, 210 F.3d 125, 130-31 (2d Cir. 2000). In the pre-trial context, few detention hearings involve live testimony or cross-examination. Most proceed on proffer. Id. at 131. This is because bail hearings are "typically informal affairs, not substitutes for trial or discovery." Id. (internal quotation marks omitted); see also Mercedes, 254 F.3d 433, 437 (2d Cir. 2001) ("[The defendant] has twice been convicted of weapon possession--one felony conviction, and one misdemeanor conviction. We find the district court committed clear error in failing to credit the government's proffer with respect to [the defendant's] dangerousness.").

III.    Discussion

  A.    The Nature and Circumstances of the Charged Crimes

The defendants' criminal conduct was extremely serious and broad in both temporal and geographic scope. The defendants orchestrated a fraud that grossed more than $27 million and involved co-conspirators both in the United States and overseas, including in the PRC. The defendants' scheme required near-constant deception – countless material misrepresentations to investors, potential investors, and the United States government. To perpetuate their long-running schemes, Li, Wang and their co-conspirators also created and used numerous corporations and bank accounts both in the United States and the PRC, including corporations and accounts used explicitly to launder and conceal misappropriated funds.

3

Li and her coconspirators also continue to perpetrate their fraud. Since at least as early as October 2021, Li and her co-conspirators have offered existing stock investors in the TEC Project the opportunity to trade in shares of TEC for shares in a blockchain company, in which Li claimed TEC owned shares. This continues a pattern perpetuated by Li and her co-conspirators throughout the charged period by which they have sought to convince existing investors that their investment will bear fruit by changing the characterization of the investment when, in fact, the investment funds have already been misappropriated.

B. The Weight of the Evidence

The weight of the evidence against the defendants is overwhelming and includes, among other things, witness accounts and voluminous records, including email, text messages and other electronic evidence, financial analysis, and recordings of the defendants. Much of the government's evidence against the defendants come from their own words—lying to investors and potential investors about the status, financial resources and imminent completion of the TEC Project.

As courts have observed, "[w]hen the evidence of a defendant's guilt is strong, and when the sentence of imprisonment upon conviction is likely to be strong . . . a defendant has stronger motives to flee." United States v. Bruno, 89 F. Supp. 3d 425, 431 (E.D.N.Y. 2015). Here, in light of the extent and sophistication of the defendants' fraud, the government conservatively estimates that they face an advisory Guidelines sentencing range of at least 210 to 262 months' imprisonment for the wire fraud scheme alone. See U.S.S.G. § 2B1.1(a)(1), (b)(1)(L), (b)(2)(A)(i), (b)(10)(B), (b)(10)(C), and 3B1.1(a).

Accordingly, the overwhelming nature of the evidence against the defendants favor their detention because they have a strong motive and incentive to flee.

C. The Defendants' Extensive Ties to Countries that Do Not Extradite to the United States

Li and Wang are naturalized U.S. citizens, both having been born and raised in the PRC. Both defendants continue to travel frequently, and regularly, to the PRC, where they have extensive business contacts and relationships. Notably, as PRC nationals, both Li and Wang likely maintain their ability to secure travel documents from PRC consular officials in the United States, enabling them to travel to the PRC. Relatedly, travel history records obtained as part of this investigation show that at least as recently as November 2016, Wang possessed and used a PRC passport to travel to the PRC notwithstanding that he is now a naturalized U.S. citizen. Finally, as detailed in the Complaint, the defendants have perpetrated the long-running and extensive fraud and money laundering conspiracies using a network of overseas financial accounts, accounts which remain beyond the reach of U.S. law enforcement authorities.

a. Li

Prior to the pandemic, between 2016 and 2019, Li traveled to the PRC at least 14 times, typically staying between 2 to 3 weeks during each trip. Li took these trips, in part, to perpetrate the fraud scheme, meeting with co-conspirators based in the PRC to market the

4

TEC Project to PRC foreign nationals. Further, Li told the Securities and Exchange Commission during a deposition in 2014 that since 2001 she was the principal of several consulting firms that helped businesses based in the PRC operate in the U.S., including by helping those companies become public companies in the U.S. The consulting firms had offices, employees, and held bank accounts in the PRC that Li controlled. In addition, the government's investigation has shown that virtually all of the funds that Li has access to currently in the United States have been transferred from overseas.

      b. <u>Wang</u>

  Wang also has traveled extensively to the PRC. Between 2016 and 2019, Wang traveled to the PRC at least 18 times, typically staying between 4 and 6 weeks during each trip. Like Li, Wang took these trips, in part, to perpetrate the fraud scheme. The government believes that the trips were also of a personal nature for Wang as his parents and siblings live in the PRC. In addition, Wang's ex-wife and two teenage children currently live in Dubai—they lived previously in Singapore—and Wang recently returned to the U.S. from Dubai in March 2022, which culminated a three-month international trip that began when he departed the U.S. for the PRC in December 2021.

    D. <u>Attempts by Co-conspirators to Encourage Victim-Investors Not to Cooperate with the Government</u>

  In or about May 2021, FBI special agents attempted to interview an investor in the TEC Project; before speaking with agents, the investor first contacted one of the defendants' co-conspirators who is a TEC employee located in the PRC. The following exchange obtained by the government shows that the co-conspirator encouraged the investor not to cooperate with the FBI, including by falsely telling him/her that the FBI would try to get him/her to lie and that the FBI had previously threatened to revoke other investors' green cards[1] if the investors did not cooperate:

| | |
|---|---|
| Co-Conspirator: | What's the deal with the US FBI? Must guard against law enforcement phishing. Better be careful. |
| Investor: | Have not make contact yet. Don't know what this is about. |
| Co-Conspirator: | Don't pay any attention. It's troublesome to get involved. They are especially nasty. Get a lawyer if necessary. Don't approach them yourself. They will induce you into giving false testimony. You will fall into their traps if you're not careful. Three years ago, we had investors who were harassed, threatened to have green cards revoked. They stopped later only after lawyers were retained. So bad. |

---

[1] In addition to falsely claiming that the FBI had threatened investors, the co-conspirator's statement is also false because, as set forth in detail in the Complaint, not one EB-5 investor in the TEC Project has received a green card.

|                  |                                                                                           |
|------------------|-------------------------------------------------------------------------------------------|
| Co-Conspirator:  | Don't send my WeChat contents to your investors group. Save everyone from worrying.       |
| Investor         | Ok.                                                                                       |
| Co-Conspirator:  | Why were the green cards being revoked?                                                   |
| Investor:        | To threaten him into giving false testimony.                                              |

As a result of these efforts by a co-conspirator to direct a victim-investor not to cooperate with the FBI, the government respectfully requests that any proposed bond include a prohibition against both defendants contacting any victims or witnesses in the case

IV.  Conclusion

The seriousness of the defendants' criminal conduct, the strong proof of the fraud scheme detailed in the Complaint and the defendants' substantial ties to countries that do not have extradition treaties with the U.S. establish by a preponderance that they are serious flight risks. For these reasons, the government respectfully submits that the defendants be released pending trial only if they each present bail packages that include, at a minimum: the posting of substantial and meaningful assets, including personal assets by family members or friends living in the United States[2]; full disclosure of the defendants' financial assets and holdings, including those located in the PRC; surrender of all passports; location monitoring; and strict limitations on the defendants' movements.

---

[2] Li's Oyster Bay, New York residence (the "Oyster Bay Residence"), which Li owns in her and her son's name and which is subject to a mortgage, is not a suitable asset for purposes of securing her return to court and the government will oppose its use in any bond proposed by Li or Wang. As detailed in the Complaint, throughout the course of the charged conduct, Li and her co-conspirators used the Oyster Bay Residence – which was the primary business location of the fraudulent TEC Project scheme – to facilitate both the charged wire fraud and money laundering conspiracies. Moreover, Li has repeatedly used fraudulently obtained proceeds from the charged wire fraud and money laundering conspiracies to make mortgage payments on the Oyster Bay Residence. For these reasons, the property is subject to criminal forfeiture under 18 U.S.C §§ 981 and 982, which the government anticipates filling notice of at the indictment stage. Accordingly, the Oyster Bay Residence would be an inappropriate asset for bond purposes. See, e.g., United States v. Ayoub, 20-CR-142, Docket No 48. (Honorable LeShann DeArcy Hall finding that, based on government's proffer and evidence provided in criminal complaint, that the defendant's residence was subject to criminal forfeiture and thus ineligible for purposes of securing the defendant's release on bail).

The government also submits that in light of efforts by a co-conspirator of the defendants to encourage victim-investors not to cooperate with the government, the Court, as a condition of release, should order the defendants not to have contact with the victim-investors identified by the government.

Respectfully submitted,

BREON PEACE
United States Attorney

By:    /s/
Robert Polemeni
Ian C. Richardson
Josh Hafetz
Assistant U.S. Attorneys

cc: Clerk of Court (SJB) (by ECF)
Defense Counsel (by Hand)